UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRETT A. BENNETT, individually and
as Personal Representative of the
Estate of Terri Rene Bennett,
Deceased; and as next friend of TAB,
and EEB, minors

        Plaintiff,

v.                                             Case No:  2:06-cv-72-FtM-38DNF

FOREST LABORATORIES,

        Defendant.
_____/

## **ORDER**[1]

This matter comes before the Court on Forest Laboratories' Motion to Exclude the Testimony of George S. Glass, M.D. (Doc. #75) filed on January 5, 2015. Plaintiff Brett A. Bennett filed a response in opposition on January 29, 2015 (Doc. #88) and filed supplemental authority on February 20, 2015. (Doc. #103). This matter is ripe for review.

### Background

Bennett retained Dr. George S. Glass as a case specific causation expert witness.[2] At trial, Glass is expected to opine that Terri Renè's consumption of Lexapro, a drug manufactured by Forest Laboratories, was a significant contributing factor to her suicide.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

[2] This matter proceeded in the Multi-District Litigation ("MDL"). General discovery and causation experts were vetted in the MDL process. This matter was remanded from the MDL and now the undersigned is facilitating the case specific facts and legal issues.

(Doc. #88-5, at 10) ("It is my opinion to a reasonable degree of medical certainty that Lexapro <u>was</u> a significant contributing factor to Terri Renè Bennett's violent death by suicide."). Glass's conclusion as it relates to Terri Renè's consumption of Lexapro is as follows:

> To summarize, in my medical opinion, based on reasonable medical probability, the clinical evidence and factual record points to the fact that Ms. Terri Rene Bennett suffered emotional blunting, emotional disinhibition, and emotional disinhibition which would have looked to be a worsening depression during the 16 days she was on Lexapro, particularly after she took the larger 10mg daily dose. In my opinion the medication was a significant contributing factor to her violent death by suicide, and while she had been depressed and had some anxiety before she began the medication, she became increasingly depressed, withdrawn, lethargic, unable to focus, anergic, and unable to function as she had before she was put on the medication. I believe that Ms. Bennett was one of the small subgroup of unusual responders to SSRI's, and manifested aspects of two of the three different pathways which can cause suicidal thinking and or behavior that Drs. Healy and Glenmullen have described. First she developed akathesias when she was put on Paxil, and then she became emotionally blunted, with emotional dysregulation when she was on Lexapro. It was that reaction to the medication, as well as the lack of sensitivity to her behavior, or fear of the consequences of her acts that were the reasons that she committed suicide.
>      These are my opinions based on the information I have been provided at this time. I reserve the right to modify my opinion should I be provided with additional information.

(Doc. #88-5, at 13).

Forest Laboratories seeks to preclude Glass's expert opinion pursuant to the Federal Rules of Evidence and the Federal Rules of Civil Procedure. The Court will address each argument below.

<u>Standard</u>

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The rule provides, in relevant part:

If scientific, technical, or other specialized knowledge will assist the trier of

2

> fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see also United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (stating that expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person" but "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.") (citation omitted).

In Daubert v. Merrell Dow Pharm., Inc., the Supreme Court noted Rule 702 requires trial courts to serve as "gatekeepers" to guarantee speculative and unreliable opinions do not reach the jury. 509 U.S. 579, 589 n. 7 (1993). The objective of this gatekeeping function is to ensure expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). A court's gatekeeping role is significant given "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it." Frazier, 387 F.3d at 1260.

To fulfill this role, the Eleventh Circuit instructs district courts to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (citation omitted). In evaluating the admissibility of expert testimony, district courts "have substantial discretion in deciding how to test an expert's

3

reliability and whether the expert's relevant testimony is reliable." United States v. Majors, 196 F.3d 1206, 1215 (11th Cir.1999) (citation omitted). Nonetheless, it is not the function of the court to determine the ultimate persuasiveness of the testimony. See Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) (citations omitted).

## Discussion

*i.   Whether there is no evidence of general causation?*

Forest Laboratories argues there is no admissible evidence of general causation underlying Glass's worsening depression theory. Forest Laboratories asserts the absence of general causation makes Glass's specific causation opinion inadmissible. Bennett's general causation expert, Dr. David Healy, identified three mechanisms by which Lexapro causes or induces suicidality: akathisia, psychotic decomposition, and emotional dysregulation or emotional blunting. (See Doc. #79-41, at 2). Forest Laboratories argues none of these mechanisms are worsening depression.

Moreover, Forest Laboratories argues Glass admits emotional blunting and worsening depression are distinct. Specifically, Healy states emotional blunting has

> an effect that can be expected to make an individual less sensitive to the consequences of their action than they would be in the normal course of events -- making it possible to act without fear of the consequences, or not to be inhibited by any moral consideration of the consequences of an action.

(Doc. #79-41, 36). Whereas, worsening depression is self-explanatory in that it means increased depression. (Doc. #88-5, at 10). Here, Glass asserts Terri Renè's increased depression was demonstrated by behavior such as her withdrawing from family and friends, not eating, and having difficulty sleeping. (Doc. #88-5, at 10). Forest Laboratories asserts such increased depression is not emotional blunting as defined by Healy. Furthermore, Forest Laboratories argues since Terri Renè left suicide notes for her family

in which she apologized and asked her husband to not view her dead body, her suicide notes demonstrate she did not suffer from emotional blunting.

In response, Bennett asserts the record reveals Healy considers worsening depression as a condition often experienced before a Lexapro user commits suicide. (See Doc. #88-1, at 1 ("The symptoms experienced by those adversely affected prior to suicide include *worsening depression* and unusual changes in behavior, severe agitation, anxiety, irritability, disinhibition, emotional liability, depersonalization, panic attacks and impulsivity.") (emphasis added)). Bennett asserts Healy's report clearly describes emotional blunting causes patients to have mood changes and become less sensitive to the consequences of their actions. (Doc. #79-41, at 36-37). Moreover, Bennett argues Healy makes it clear that worsening depression and disinhibition are precursors, adverse effects that are the harbingers of a Lexapro-induced suicide.

Upon consideration, the Court finds the Healy and Glass opinions and explanations are consistent. For example, Healy explicitly stated a common symptom prior to Lexapro induced suicide is worsening depression. Glass's opinion that Terri Renè suffered from worsening depression, emotional blunting, and emotional disinhibition prior to her suicide is consistent with Healy's opinion. There is sufficient evidence to support general causation.

With regard to the suicide notes, the Court finds they do not conclusively demonstrate Terri Renè did not suffer from emotional blunting. The definition of emotional bluntly merely indicates an individual is *less sensitive* rather than completely crass or impervious. It is arguable that Terri Renè's behavior, such as withdrawing from friends and not eating, was her behaving with less sensitivity to the consequences of her actions.

Moreover, committing suicide is arguably an act done without fear of the consequences. The court is unwilling to grant the motion in light of Forest Laboratories' arguments.

    *ii. Whether Glass employed a proper methodology?*

        *a. Whether Glass's review was incomplete and selective?*

Forest Laboratories argues Glass did not review all relevant records because they were not provided to him by Bennett's counsel. More specifically, Forest Laboratories asserts Glass did not review (1) the records of Dr. Herrera, the gastroenterologist who treated Terri Renè (Doc. #88-6, at 5); (2) literature demonstrating how gastrointestinal disorders affect depression; (3) abstracts of Dr. Gage, Forest Laboratories' case specific causation expert; the records of Dr. Campbell, the doctor that prescribed Prozac to Terri Renè for depression (Doc. #88-6, at 47); or (4) the records of Dr. Bourgeois. Forest Laboratories argues Glass was unaware of Bennett's depression and migraine history. Forest Laboratories supports its argument with two cases. See Guinn v. AstraZeneca Pharms. LP, 602 F.3d 1245 (11th Cir. 2010); In re Trasylol Prods. Liab. Litig., No. 08-MD-1928, 2013 WL 1192300 (S.D. Fla. Mar. 22, 2013).

In response, Bennett argues Glass reviewed several materials before reaching his conclusions. (See Doc. #88-5, at 2; Doc. #88-6, at 6-7). Bennett argues Glass reviewed all of Terri Renè's medical records during the last few years of her life. Bennett admits a few older medical records, created ten to fourteen years before Terri Renè's death, were not provided to Glass due to an administration error. Nonetheless, Bennett argues some of the medical records mentioned by Forest Laboratories were reflected in other materials reviewed by Glass. For example, Dr. Herrera's records were reflected in Dr. Lukasiewicz's records and deposition that Glass reviewed. (Doc. #88-6, at 19). Bennett argues Glass

knew Herrera's findings with regard to Teri Renè. (Doc. #88-6, at 18-20). Bennett asserts Glass was aware of Terri Renè's gastrointestinal, migraine, and episodic depression. (See, e.g., Doc. #88-6, at 21, 47; Doc. #88-5, at 9-10). Bennett argues any errors or inconsistencies in Glass's report go to the weight rather than admissibility of his testimony. Bennett supports his argument with a case. See Chiles v. Novartis Pharm. Corp., No. 3:06-cv-96-J-25 JBT, 2013 WL 5769903 (M.D. Fla. Feb. 7, 2013).

Upon review, the Court finds Glass's testimony is worthy of admission at trial. Bennett has shown Glass was aware of Terri Renè's history with regard to migraines, depression, previous medications, and the like. Knowledge of her history is reflected in Glass's expert report and deposition testimony. This case is significantly distinguishable from Trasylol and Guinn. See generally In re Trasylol Prods. Liab. Litig., 2013 WL 1192300 (an unpublished Southern District of Florida case applying Colorado law that excluded expert testimony for *several* reasons including the expert's failure to review all records); Guinn, 602 F.3d 1245 (an Eleventh Circuit opinion addressing (1) whether the expert failed to adequately consider and rule out other potential causes of the plaintiff's disease; and (2) whether the expert's methodology was unreliable because it was based on the temporary proximity of her ingestion of a particular drug to her diagnoses of her disease.). Glass's reliance on Terri Renè's medical history is reliable. Whether Glass did not review a particular medical record goes to the weight of his testimony rather than admissibility.

> b. *Whether Glass employed a reliable differential diagnosis?*

Forest Laboratories argues Glass failed to perform a reliable differential diagnosis because he did not eliminate depression as the cause of Terri Renè's suicide. Forest

Laboratories asserts Glass failed to provide scientific reliable evidence to support his theory that Lexapro significantly contributed to Terri Renè's worsening depression and suicide. Forest Laboratories asserts Glass relied on untested hypotheses, temporal relationship, and speculation.

Forest Laboratories attacks Glass's opinion by arguing it fails to rely on a particular Food and Drug Administration Public Health Advisory, fails to rely on peer reviewed materials, and concedes Lexapro helps the majority of its users. Forest Laboratories takes issue with how Terri Renè used another Selective Serotonin Reuptake Inhibitor ("SSRI") drug, Prozac, without indicating a side effect yet now supposedly Lexapro induced her to commit suicide. Forest Laboratories asserts Glass failed to explain how Terri Renè was able to use Prozac successfully but not Lexapro. In light of Glass stating it is "hard to tease out which would be worsening depression and which is the Lexapro," Forest Laboratories asserts Glass improperly used a temporal relationship, *post hoc ergo propter hoc* fallacy, and *ipse dixit* analysis to reach his conclusions.

Forest Laboratories cites to several cases for support. See Hendrix v. Evenflo Co., Inc., 609 F.3d 1183 (11th Cir. 2010); Kilpatrick v. Breg, Inc., 613 F.3d 1329 (11th Cir. 2010); In re Denture Cream Prods. Liab. Litig., 795 F. Supp. 2d 1345 (S.D. Fla. 2011). Forest Laboratories also cites to cases that excluded Glass's expert opinion. See Hendrix, 609 F.3d 1183; Adams v. Hooper, No. 7:12-cv-1942-LSC, 2013 WL 5777032 (N.D. Ala. Oct. 25, 2013).

In response, Bennett argues there is no dispute that depression is a risk factor for suicide. Glass readily acknowledges and considers depression as a risk factor in his report. (Doc. #88-5, at 9-10). Bennett asserts Lexapro itself can cause suicide beyond

8

any underlying depressive illness. See In re Celexa & Lexapro Prods. Liab. Litig., 927 F. Supp. 2d 758 (E.D. Mo. 2013). In addition, Bennett asserts drugs like Lexapro now have a black box warning label that states, "Patients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, and unusual changes in behavior." (Doc. #88-9, at 3). Bennett argues such labeling demonstrates Glass's opinion is quite reliable.

Bennett asserts Glass utilized a psychological autopsy to arrive at his conclusions. A psychological autopsy is considered by some organizations as a best practice postmortem procedure to reconstruct the proximate and distal causes of a death by suicide. (See Doc. #88, at 12 n.15). Bennett argues this methodology has been accepted by courts before. See, e.g., In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig., MDL No. 1629, Master File No. 04-cv-10981-PBS, 2009 WL 3756328 (D. Mass. Aug. 14, 2009). Bennett asserts in order to reach his conclusion, Glass (1) listed the protective factors; (2) considered the risk factors for suicide; (3) ruled out gastrointestinal issues; (4) considered whether the depression alone caused Terri Renè's suicide absent the use of Lexapro; and (5) then concluded Lexapro significantly contributed to Terri Renè's suicide. (See Doc. #88-5; Doc. #88-6).

In addition, Bennett rebuts Forest Laboratories' assertion that his methodology is untested as untrue and unfair. Bennett asserts Glass bases his thoughts on a scientific publication entitled BIOLOGY OF DEPRESSIVE DISORDERS and studies done via autopsy on suicide victims that reflect lower than expected levels of serotonin. (See Doc. #88-5, at 2). Moreover, Bennett asserts in 2007 peer-reviewed scientists acknowledged SSRI, like Lexapro, cause a small subset of vulnerable patients to become suicidal. (Doc. #88-21).

Finally, Bennett asserts this case is distinguishable from the cases where Glass's opinion were excluded.

The Court is persuaded by Bennett's arguments. Glass's reliance on a psychological autopsy is reliable. See id. at *9 ("Suicide is a multi-factorial phenomenon with factors which cannot be ruled out by a testable, established scientific method. Instead, suicide experts and other health care professionals rely on tools like the psychological autopsy—along with their professional experience, education, training, and observations—to 'rule in' or 'rule out' various factors. This approach will never produce the definite and testable results expected and demanded in many scientific inquires; it is, however, the generally accepted methodology for analyzing the causes of a particular suicide and far from the 'junk science' that Daubert and Rule 702 are designed to exclude.") (citation omitted). Such differential diagnosis is an acceptable methodology in light of the facts and circumstances and Glass's method in analyzing the data and drawing conclusions therefrom. See Cross v. Forest Laboratories, No. 1:05-cv-00170-MPM-SAA, 2015 WL 728511, at *2 (N.D. Miss. Feb. 19, 2015) (citing Johnson v. Arkema, Inc., 685 F.3d 452, 468 (5th Cir. 2012); Pick v. Am. Med. Sys., Inc., 198 F.3d 241 (5th Cir. 1999); Harris v. Spine, No. 3:12CV874TSL-JMR, 2014 WL 4179915, at *6 (S.D. Miss. June 23, 2014)). Any criticism that Forest Laboratories has as it relates to Glass's method goes to the weight of his testimony, and not its admissibility. Cross, 2015 WL 728511, at *2.

Glass's opinion regarding Terri Renè is supported by peer reviewed materials. Glass objectively provides reasons for eliminating other causes for Terri Renè's suicide. (See, e.g., Doc. #88-5, at 10). The record reveals Terri Renè did suffer from adverse effects to SSRIs. (See, e.g., Doc. #88-5, at 7). The Court finds Forest Laboratories'

temporal proximity argument to be unpersuasive in light of the facts and circumstances. Here, there is ample evidence of an established scientific connection between consumption of Lexapro and suicide in the general population, especially within the first few weeks of treatment. Cross, 2015 WL 728511, at *4. It is not improper for Glass to use temporal proximity of Terri Renè's consumption of Lexapro and suicide as a basis for his belief that Lexapro was a significant cause of Terri Renè's suicide. Id. Unlike the facts in Kilpatrick, Glass did not merely look at Terri Renè's suicide after the use of Lexapro to reach his conclusion. See Kilpatrick, 613 F.3d at 1343. This is not a situation with a *post hoc ergo propter hoc* fallacy or improper *ipse dixit* assertion.

The Court finds some of Forest Laboratories' arguments miss the mark. For example, Glass opines Terri Renè is part of a minority who have committed suicide as a result of consuming Lexapro. Glass never asserts the majority of Lexapro patients commit suicide, thus an attack as it relates to the majority of Lexapro users misses the mark. After all, if the minority of Lexapro users did not exist, there would be no black box labeling addressing suicide in adults now. Furthermore, the Court finds the cases where Glass has been excluded are astronomically distinguishable from this instant case. For example, Adams does not address Lexapro or similarly situated SSRI drugs. See Adams v. Hooper, 2013 WL 5777032. Upon review of the record, the Court finds Glass's testimony is based on sufficient facts and data, is the product of reliable principles and methods, and is the result of a reliable application of the instant facts to the principles and methods. The Court finds no proper basis to exclude Glass's testimony.

Accordingly, it is now

**ORDERED:**

Forest Laboratories' Motion to Exclude the Testimony of George S. Glass, M.D. ([Doc. #75](Doc. #75)) is **DENIED**.

**DONE** and **ORDERED** in Fort Myers, Florida this 9th day of April, 2015.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record